Whether Mr. Hinkson will serve 33 years on the convictions in this case is a matter of great importance to him, but with an en banc hearing, the importance of this argument and the Court's decision will pass far beyond the boundaries of this individual case. The government, I submit, is asking this Court to take positions on multiple evidentiary issues that conflict with the United States Supreme Court opinion, with the opinions of these courts, which simply don't make sense and which the government itself would rebel against if they were ever applied to them. The heart of the trial court's ruling was that the evidence that we're talking about here, which is now conceded that the principal witness on the government's charges, the only charges in which Hinkson was convicted, was a complete fraud and a liar and brought to the stand, forged documents, with the intention of perjuring himself. That evidence proving that indisputable government documents were inadmissible under the rubric of Rule 608B. Counsel, could you help me rule something out, if it should be ruled out? As I understand it, you have not made an argument based on our decision in LaPage that the prosecutor knowingly put on perjured testimony. Is that correct? I think it is correct to say that what the prosecutor knew before his witness got on the stand was that the witness had told the lie in the grand jury. Because he was woodshedding, to put him on the stand and said, well, you testified before the grand jury that you were wounded in the Korean War and you couldn't have been in it, you were too young. And the witness then said, oh, well, it was after the Korean War. But that's what the witness said on the stand. When you woodshed witnesses, often lawyers acting ethically tell their witnesses basically don't lie. So as I understand it, what you just said does not establish that the prosecutor knowingly put on perjury at the trial. I agree, Your Honor. What the prosecutor did do was in closing argument, after the witness, the following testimony was still in the record, that the witness said that he was a disabled veteran. He said that he was an excellent shot, and he had testified that he had told Mr. Hinkson that he was a war hero and killed many people in combat. What the prosecutor didn't do and could have, and if he did, we wouldn't be here today. Because one of two things would have happened. There would have been an acquittal or a conviction that couldn't be assailed. What he didn't do is say, ladies and gentlemen of the jury, I told you in opening that Mr. Swisher was a combat veteran. Hold on. I really don't want to lose the thread of my question here, because there's a special body of law for when the prosecutor knowingly puts on perjured testimony. And now that we're talking about the closing argument, I think we're not talking about that body of law. Let me be as precise as I can. The prosecutor intended to have his witness testify that he was a combat veteran in Korea because he had testified before the grand jury, and that would be a very helpful fact. What he realized was that if he put on that testimony that the – well, he couldn't put on that testimony because he realized that wasn't true. He couldn't put on the testimony that Mr. Swisher proposed he would give, which is that he was wounded after the war, because that would allow impeachment by his grand jury testimony. So he decided in direct not to elicit that. But what he did do was knowingly send a witness up to the stand with documents that he suspected at that point could be false. The word suspected is the word that interests me there. And I'll stand with that. I think you have now conceded that the prosecutor did not knowingly put on perjured testimony. In the words of United States v. Wallach, which was quoted by this court in Kajoyan, what the prosecutor did was suspected that this witness was going to lie on the stand and turned away from it. He had a deep suspicion that something false was going on. So he avoided asking the questions where he feared the witness would lie. He did. But what he did not do is say, take off that purple heart and whatever you do, don't show that document on the stand and don't give a description of your war efforts that you gave to me. Did the prosecutor know? I don't recall a finding by the trial judge that the prosecutor knew either that the witness had the phony documents in his pocket or that the witness would produce them. It's undisputed that the prosecutor said, yes, he showed me these documents this morning. I saw them this morning and I examined them this morning. But did he know they were phony that morning? What he knew was that they were inconsistent with the witness's grand jury testimony. When did the prosecutor get the word from, I think it was the local Veterans Administration, was it, that their records weren't matching up? No, he got it from the Marine Corps, didn't he? Well, it is a Marine Corps document saying that all of this is false. Apparently the government has submitted a supplemental submission, and they ask you to take judicial notice of it, that says that he received the documents on the 19th of January, which would have been several days after Mr. Swisher testified. The interesting thing is that the government's own submission demonstrates that they turned over to the court and the defense the dowling letter, which says this is nonsense. This guy never received these accommodations. He was never in combat. But what their recent submission demonstrates is that the government did not turn over to the defense documents from the Veterans Administration, which said this is a fraud. We now realize we've been defrauded. The significance of that, Your Honor, is that when the government last argued against the admission of the dowling material, it said to the court, it said, look, it said at that point, look, we may be dealing with a fraud. But the Veterans Administration found this stuff credible, so we'd have a big, you know, to-do and embroilio in court about the truth of this. What the government did not say to the trial judge at that time is we have received documents from the Veterans Administration itself, the very people who granted this guy his military benefits, that say they now realize that it is a fraud. And with those documents in hand, it said that we now are dealing with a fraud. It argued to the government. All they had to do, consistently cajoling, is say, look, ladies and gentlemen of the jury, ignore my assertion that this guy was a military veteran. That was wrong. Do not base your verdict on the fact that he's a combat veteran. But nothing prevents you, ladies and gentlemen of the jury, from saying, well, he wasn't. He was a military veteran. He was a Marine. He was not a combat veteran. He had never been in combat. Nothing prevented the government from saying, he's not a combat veteran. Ignore my assertion to that effect. Don't draw that conclusion from any of his testimony about being a disabled veteran. However, you are still entitled to consider whether Hinson believed them, took them seriously. Now, I think we've taken care of knowingly presenting perjured testimony. You're relying on cajoling for duty with respect to the closing argument? I'm relying on cajoling for a duty with respect to the closing argument. I'm relying on cajoling for a duty to disabuse this jury, because this jury convicted believing they were dealing with a military combat veteran. They returned a verdict based on that false premise. Mr. Reardon. I believe, apparently, the other witnesses. That's correct. The combat veteran remark came out in the opening statement. Yes. Two days before the Federals got the letter from Tolbert, right? It could be as much as a week. The jury was instructed, pattern instruction, that evidence did not include what the attorney said. So where's the evidence that Mr. Swisher was a combat veteran? Evidence. I'm not talking about opening statements. Evidence that remains in the record, Your Honor, is this. Mr. Swisher says, I'm a disabled veteran. That testimony remains in the record. I'm an excellent shot, and I was in the Marines. And he said, and I told Mr. Swisher that I was a combat veteran who had killed many people in combat. Your Honor, I submit to you that if there's a security guard here or at a party, and someone comes up and they say to them, are you entitled to enter here? And they say, I've told everybody I'm entitled to enter here. I told people I was a member that almost all human beings will take that as a statement, that I told someone that I am such is a statement that I am telling you that this is what I am. So the jury had the unrefuted testimony that he was a Marine, a disabled veteran, an excellent shot, and that he had told others of having killed people in combat, combined with the statement in opening that said he is a combat veteran. And as Kajoyan says, what prosecutors say makes a great deal. Why does this matter here? It seems like if he fooled the VA for all those years to get a bigger pension, no reason to doubt he could fool Hinkson, and he was a great shot. Well, who says that? Who says that? He said that. Hinkson did, too. He said that. No, Hinkson didn't say he was a great shot. Hinkson said they went shooting one time, and he could barely sit up in his chair. I think he said he got six out of six trap shooting, didn't he? I believe that that was the testimony of Mr. Fischer himself. But, Your Honor, you bring up an interesting point. He didn't fool the Veterans Administration for all these years. This is a very critical point on the question of bias and interest. This conversation supposedly took place in January of 2003. Hinkson is arrested because Harding said there was a conversation with him of which the jury did not convict. Mr. Fischer doesn't come forward with any story of having been solicited. He doesn't come forward until many months later, and when he comes forward, his coming forward and saying, oh, yes, I'm a combat veteran and he solicited me to do that, coincides for the first time with him going to the Veterans Administration in late 2003 and early 2004 and claiming for the first time veterans' benefits for being a combat veteran. In other words, the fraudulent scheme to defraud the government of benefits began in January or February of 2004. The Keeley letter asking the Marines, is this stuff true or not, is dated January of 2004. In February of 2004 is the first time he registers this phony forged document with the county, and it's the same month he testifies before the grand jury for the first time. So we have a situation in which his claim to be a military combat veteran in court, in a criminal case, coincides with his fraudulent scheme to defraud the government of combat veterans. Therefore, he had a bias and interest in maintaining, both in the criminal case, what he was defrauding the government of in the civil proceeding to avoid being prosecuted. And bias and interest, as we all agree, has nothing to do with Rule 608. Rule 608? Go ahead. Why did he file it with the county? Because he wanted to get something that said certified. It's like he went down to the DMV. In fact, when he went into court, he said, we had to go all the way to the head of the Marines to get this officially certified. He didn't have a Marine certification. He went and got it certified by the local county assessor. Can I ask you this? Let me ask you this. Was he looking to get a veterans exemption on real property taxes? A lot of states do that. Well, I think that what he was doing was looking for some stamp of authenticity on this phony record. But here's the astounding thing that I just have to say to the panel. We agree, we all agree, that if you had a financial interest, a lawsuit against somebody, that comes in, 608 doesn't apply, it's bias and interest. If you're having an affair under the facts of Oldham versus Kentucky, that comes in to show bias and interest. A probation report comes in to show a bias and interest. If you're on probation. The reason we don't subject those to 608 is that motivation, we believe, is sufficiently important that you can prove somebody has a motivation to lie to permit an inference, well, if they have a motivation to lie, maybe they lie. Look at what we are dealing with in this case. We are not dealing with proving a motivation to lie. We are dealing with proving a plan to lie, not generally, not in terms of a general character. In this case, Mr. Swisher gets up on January 14th, 2005, plants a phony purple heart on his lapel so he can wear it into court. That was a little bar. He's got the purple heart. He's got the bar, he doesn't have the purple heart. Well, there is no question that when he's asked about it, and this is apparently the same insignia he wears when he goes amazingly. Well, I know about, I have a purple heart. My father had a purple heart, so I know what it's about. But it's what he wore to the court. I'm not challenging you, I'm just saying. No, no, I understand. And you're clearly more knowledgeable on the subject than I am, but it's what he wore when he was getting out purple hearts to the grieving father. Maybe not by the time you're done with this argument. Let me just finish the point. So we allow extrinsic evidence on the question of motivation. Yes, I've been listening for a while. I haven't heard you address yet our standard of review and how all this ties in. I mean, you've made a very good case, and I read the panel's opinion, which went at great length and into many of these matters. But ultimately we review for abuse of discretion, do we not? Provided, though, that an error of law is an abuse of discretion, or a ruling founded on an error of law is an abuse of discretion. Where is the error of law here? The error of law is that 608 does not apply to evidence of bias and interest, which this was. And the error of law is this. I propose that it is absolutely an error of law to say that indisputable evidence that someone is going to lie in this proceeding is not evidence of a character for veracity or its lack. It's evidence that they're going to cheat and lie in this proceeding, and if we can prove motivation to lie without 608 being applicable, how could we not do this? Can you imagine if the government... Well, Mr. Reddin, at the trial level, what was the offer of proof under what theory were these documents to be admitted? It seems to me you're arguing a different theory than they were in the trial court, and that's what I want you to clear up for me. Well, I... Because, you know, if on the one hand, say, if you offer something and the court rules on it from that standpoint, and now you've come up with another theory where it may have been admissible for the first time on appeal, that doesn't give the trial court a fair opportunity to rule on that. I take it to be the waiver question, and let me point to it, because the government, in its opposition to our supplemental brief for the first time, raises waiver issues. The government is not permitted to waive waiver issues in a petition or a response to a petition or rehearing, so, Your Honor, they have waived the error. But the reason why that is true is their assertions about these issues not being raised before the trial court are wrong. The judge below, the trial judge below, ruled on the question of whether this was bias or interest. In his new trial motion, he says it's not admissible as evidence of bias or interest, and the rulings of this court are if you're committing crimes while a witness for the government, it does go to your bias and interest. So that's completely preserved. The judge below, the trial judge below, at ER 139 of our brief, said I'm ruling this out. I'm not permitting it on the issue of bias or interest. So no one can say if the judge had really just been directed to bias and interest, then he might have come out with a different ruling. His ruling on bias and interest is wrong as a matter of law. His ruling on whether proof of- Was there a 403 ruling also on that? He did make a 403 ruling, and the ruling on 403 is not only based on- It is an abuse of discretion to rest a ruling on something for which there is no evidence. He said, well, we'll have to have a proceeding where witnesses will have to testify. That's not true. He made an error of law when he said in order for you to get in the Dowling report, you have to produce a witness. That is absolutely wrong. The law of the United States Supreme Court is that if you are dealing with a government report, as this was, and that government report is located in a government file, that's the only foundation required, and indisputably the Dowling report was in a government file, was in Swisher's military records, then no further foundation is required. Well, let me ask you this, though. After there was an adverse ruling on the 608 and 403 against the appellant, then the appellant chose-well, the trial counsel chose not to cross-examine at all. The trial judge did say you can cross-examine in certain ways. What are we to do with that? Here's what you do with it, Your Honor. Here's what you do with it. I'm going to ask the other side. The initial exchange is, hey, Mr. Swisher, aren't you lying? You didn't get a Purple Heart. Oh, yes, I did. Here's my confidential document. Here it is. It's all detailed. So, boom, the defense is knocked on its back. It later turns out this is a complete fraud, and the defense wants to call him off and says you lied. Here's the Dowling report. You're a big liar. The judge says, oh, you can call him back, but all you can do is ask him, were you lying? Are you really a military veteran? The government conceded that Swisher would lie again. They say the Swisher is going to say it's not true. And you know what he's going to pull? He's going to pull out his DD-214 and say, the Dowling report, here's the evidence right here, and the jury is going to see neither the Dowling report, which is true, nor the DD-214, which is false, and the jury is going to conclude, as this court said in Slovik v. Evans recently, when it issued a habeas corpus because of a limitation on proof of a relevant matter, it's going to say, oh, the jury is going to say he tried, he went fishing for lies, but I guess he fell on his tush because if there were any government documents showing that this guy was a liar and wasn't a combat veteran, we would have seen them. The right is not, there isn't a right to cross-examine, but there's a concomitant right to present the defense. Counsel, when taking your argument where it is so far as correct, and I think it is, that the amendment to the rule limits the rule against extrinsic evidence to where the sole reason is an attack on character for truthfulness, and evidence can come in for proof of bias or other motivation. The advisory committee note says the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment to rules 402 and 403. It looks from the transcript as though the trial judge decided it's going to take a long time to figure out whether this guy's phony or not on the Purple Heart. We've got conflicting documents that are hard to understand by themselves without somebody to explain them. Why don't we just tell the jury, don't treat him as a Purple Heart holder, and go on from there? Because fundamentally, the question isn't whether Swisher's lying about his Purple Heart, it's whether Hinkson hired somebody to kill people. Right, but in terms of, let me deal with the 403 question. The judge was wrong in two respects. One, the judge said this initially. He said, I think there's conflicting documents. There are no conflicting documents. There is no evidence anywhere. The government could not have called one witness or offered one document to suggest the truth. Sure there were conflicting documents. Swisher, on the one hand, there was this document that says, we don't see Swisher having been in combat and gotten a Purple Heart, and on the other hand, Swisher has one right in his pocket that looks like a regular official document that says he does have a Purple Heart. Right. It would have taken five seconds. All I'm saying is this. It would have taken five seconds to put the Dowling Report in, which is an official investigation by the Marines that says that DD-214 is rubbish. Those commendations didn't even exist at the time. The government could not have refuted that. They could not have called a witness because we now know that Swisher was a complete fraud and there was no truth to what he was saying. The trial court made two mistakes, and part of this was the fall of the government. The mistakes it made were there were no official documents supporting Swisher's version. Number two was it said that it would require a witness when it doesn't to put in the Marine Reports, which no one who read the Marine Reports could seriously contend that there was any truth to what Swisher said. But here's the third thing, Your Honor, and this is critical. The government at that moment was withholding from the trial judge other documents that it had in its possession, which it had put before this court in only the last two weeks, saying that the Veterans Administration had reached the conclusion that Swisher was a phony while making a 403 argument to the court that this will be a big, messy imbroglio because at least the people over Veterans Administration believed that stuff. We have the statement from Keeley saying, I got the Dowling letter and this is complete fraud. And they never gave that to defense and apparently they never gave it to the trial judge. So the trial judge was making a 403 ruling in the dark because the government was suppressing and violating its bravery obligation to turn over those memos from Keeley saying, I now realize that we've been defrauded. Let me ask you a question. The documents you got from the government, they were authenticated, weren't they? They came right out of the, they were subpoenaed from the National Records Service? The document that he pulled out of his pocket, that wasn't a Purple Heart certificate or anything. That was just another document. And was that authenticated? No, he said that he had, he went through this. I mean, was it authenticated? No, no, no. What the trial judge by the end of the trial had was he had the official records of Swisher containing the correct DD-214, which was his resignation paper saying no commendation, no combat service. And over here it had a correct version of the document that Swisher had submitted to the VA earlier when he wasn't involved in this fraud, which didn't have any accommodations. And then the forged one that he made up. And the file of the government proved that the forged one was exactly what it was. It was not. Let me ask you this question in response to the question as to whether there was evidence in front of the jury as to his having been a combat veteran. We, of course, have the government's opening statement that he was. That's not evidence. We understand that. He was wearing a replica Purple Heart, which I understood from the record to be not a bar, but actually a replica heart-shaped thing that was purple. That's how they refer to it, a replica Purple Heart. In other words, a ribbon. It's a ribbon. No, it's not a ribbon. It's a decoration. What he's wearing is described in the record as a replica of a Purple Heart. Now, a Purple Heart means you were wounded in military combat. Was wearing the replica Purple Heart itself evidence from him that he was saying by wearing it that he was a wounded combat veteran? In the same way, Your Honor, that if some witness got on the stand and was wearing a Roman collar or other indicia of being clergy and is sitting there in front of the jury, could not the prosecutor, the defense witness, say, You're wearing a Roman collar. Are you a Roman Catholic priest? And if he says yes, there is no judge in this country that would prevent the government from proving him to have gotten on the stand wearing a phony indicia, lying about it, would prevent the government from putting in extrinsic evidence that this is a lie. But it seems that the record was insufficient even for the defense counsel when he started to examine that he would even know that it was a Purple Heart. He didn't even know what exactly it was at the time and, therefore, did not examine at all in the direct cross-exam, didn't go into it at all, didn't come up with it at all, in fact, didn't say anything about awards or that kind of stuff until he moved to reopen. And even then he wasn't sure, it seems from the record, that this was a Purple Heart on somebody's vest. Well, he had received the Tolbert letter, and the Tolbert letter said there doesn't appear to be a Purple Heart. He says, Are you wearing a Purple Heart? And the witness says, I am. I mean, the worry that I have is that we're trying to extrapolate evidence here. So I'm trying to figure out, as my colleagues suggested, what evidence do we have? We can't use the prosecutor's statement. I don't see how we can say that just because somebody wears something to the courthouse, nobody even knows whether it's a Purple Heart or not, that that's evidence. So where do I get my evidence? But we know this. We know this. We know that if a prosecutor was standing in a hall and a witness for the defense came by and dropped a piece of paper and the prosecutor picked it up and it's a letter to this witness from the defendant saying, Here are the things I want you to say in my behalf today, and stick to the script. No judge would keep that out. That plan to offer scripted testimony goes to the credibility of that witness. We know that this evidence proved that this man got up and said, I am going to lie. I am going to lie today in a federal criminal proceeding. He got up in the morning to say that. And he lied to the prosecutor. He brought the documents. Is this court going to issue a ruling that says whether an announced intention, an indisputable intention to lie in a criminal case and send somebody to prison for 33 years is a collateral matter? He lied about something. Let's assume that he did lie. And let's assume the district court did, just to get past that argument. I am still, I haven't heard the answer to my question about abuse of discretion. Let's say there was an error of law. This was not a witness who has been found to have lied about a central aspect of the crime. This is something about who he is and, you know, whether he was wounded in battle or he didn't get wounded in battle or had a purple heart or didn't have a purple heart. Why can't a district judge who was there for the entire proceeding reasonably conclude that even if there was a lie, it just didn't go to anything to the heart of the case and therefore deny a new crime? Judge Kaczynski, this is a crime that has, as an element of it, proof of strongly corroborating circumstances that something is serious. I don't think that having a purple heart is an element of the crime, as I understand the statute. Is having a purple heart part of the crime in some way? Being a killer is part of the government's theory that the reason Harding, there's no conviction on Harding, there's no conviction on Bates, why is there a conviction on Swisher? The heart of their case is these people, you know, maybe whoever they are, but he went to a hired killer and the fact that he was a killer is important because he was a 68-year-old guy, you might not say, who would seriously go to this guy to kill somebody. The whole theory of this was that he knew how to kill. He was not adverse to adverse and dangerous activity. And the fact that that was the central theory of the prosecution. He was a Marine. He was a Marine, and I understand they get trained to kill even in peacetime because you never know when you go to war. So that part of his story was not false. But what he said was that... Am I... Yes, yes. But what he said is Hinkson said, oh, I want to kill people. And he said, I want you to do it. Why do you want me to do it? You have killed people before. Well, according to the government, this is what Hinkson said, and his response was, I have killed people in defense of myself and my country or my fellow soldiers, but I won't do this. The exchange about being a war hero was the essential corroborating circumstance. This jury would know. He could have had a conversation with the defendant whether or not he was a war hero. In fact, it's entirely possible that just as he lied on the stand, the more he proved that he lied on the stand about his status, the more it tends to show that he probably told the same kind of lies to the defendant. Judge Kuczynski, we're not arguing about insufficiency of the evidence here. We're arguing about whether the defense was deprived of the opportunity to knock out. No. The issue is abuse of discretion, and I've asked you three times now, and you have yet to address a standard. Abuse of discretion, a standard that gives the trial judge a vast amount of deference because he was there and saw the proceedings unfold. You have not said, you know, you're over your time. I think the abuse of discretion was that this man came and he said he was a Purple Heart veteran, a combat Marine, and that was very, very effective, and he could have been impeached and shown that he was a fraud and it would have been an entirely different story.  Well, can I have 30 seconds to very directly answer you, Your Honor? Absolutely. Because I thought... I'll let you. I'll accept Judge Pegasus' answer and let you build your on top of that. An abuse of discretion... Well, you know, a lot of us don't get a chance to talk much because we have some that monopolize these conversations. Including myself. Yeah, not you. No, I think you're a pretty good lawyer. Thank you. It is an abuse of discretion if the judge's ruling was wrong, legally wrong. He ruled that evidence of a plan to lie in this particular case... I gave you that. Okay. I gave you that for purposes of my question. I said, let us assume that the district judge did abuse of discretion. I'm sorry, did err in his adventure. I gave you that as a given. Then it is an abuse of discretion to rule as the trial judge did, perhaps in good faith because the government was fooling him, that this would take a considerable amount of time when it would have taken no time at all. He thought that there needed to be a foundational witness, and that's not true. Government reports come in simply on the fact that they're in the file. And here's the other thing. There's no consumption of time required. The report would have come in very quickly. And secondly, there's no prejudice to the government at all because all of this would have proved that he was a liar in this case, which is... You're out of your time. Thank you. We'll hear from the government. Good afternoon, Your Honors, and may it please the Court. My name is John DePue. I'm an attorney with the National Security Division at the Justice Department. Counsel, before you get into your argument, I have to ask you, what are you wearing on your lapel? That's the Distinguished Service Medal, Your Honor, and I have a replacement DD-214 in my pocket with proof of that. Now, there is a difference between... My eyes aren't all that great, but is that a bar? That's the bar. And it's my understanding that what the defendant was actually wearing or what Swisher was actually wearing... You're not going to be testifying for us, are you? I don't know. We're having a lot of evidentiary problems here today. I don't think you can add to it. It's in the record. But I am hoping to understand the difference between what I'm looking at right now and what is in the record. While the evidence is not in the record as to what the defendant was wearing, I anticipated that you might ask this question. So I did ask an FBI agent, and what he told me is he was wearing a small plastic depiction of the... And if I were the trial court judge right now, I would be instructing you not to give that text-to-record evidence. We should not be considering that. That's probably correct. That's absolutely right, Your Honor. That's absolutely right. Were you trying to tell us what an FBI agent who was in the courtroom told you he was wearing? Yes. Is that what you were trying to tell us? Yes. Oh. Is there anything in the record which indicates that whatever it was that he was wearing was more than the bar, which is... Nothing in the record. ...white on each hand and purple in the middle? That's exactly right, Your Honor. Well, no, that is quite wrong. Why are you wearing that distinguished service medal? Because I earned it while I was in the Army, Your Honor. Because you're impressing us, right? And you impressed me when you said that. And if a guy's wearing a purple heart medal, that's going to impress some people. So, you know, you wear it, and I honor you for your service. They're not easy to come by next to the Congressional Medal of Honor. And I look at you, and I think, this guy's got credibility. He's standing there.  But that's also true if he's wearing a purple heart medal or a silver star or a bronze star. I might very well agree with that if I could see and understand what it is. I'm looking at that. I don't know what it is. I accept your representation of what it is. But if I were sitting in the jury, and even if I were this close to where you are right now, I wouldn't know what that is. But the argument, of course, Your Honor, is whether it's communicative. And that's a very good and very genius argument. And the trouble is there are not too many veterans around anymore. Let's know what those things look like. You know, I'd like to interject here. I know the record in this case fairly well. The U.S. government itself described that in court as a purple heart replica, not a bar, but a purple heart replica. And there seemed to have been no difficulty in the courtroom knowing that it was a purple heart replica. I don't see why a bar that you're wearing is relevant to whether there was a purple heart replica, as the government itself at trial described it. He did not say bar. He said replica. Of course, Mr. Sullivan also indicated that he had no idea what it was. Mr. Sullivan said a lot of things that he had no idea about. We tend to describe to him a malevolent intent on putting Swisher on the stand wearing it because it's apparent that he simply, like so many other people, didn't know what it was. I'm not talking about his intent. I'm talking about what Swisher was wearing and what Swisher was thereby testifying to tacitly by what he was wearing. He was wearing a purple heart replica. There were repeated references through that morning about the purple heart. There was no dispute at all in front of the jury that what he was wearing was a replica of a purple heart. And where that leads you, Your Honor, is to your very ingenious argument that this was communicative I don't think it's ingenious at all. It's very straightforward. If I wear a clerical collar, that says I'm a cleric. It may be very straightforward, but the problem is, like so many other of the defendant's theories under Rule 608, is that almost none of them were proffered to the district court judge, and therefore the plain error doctrine under Alano applies, and he's made no effort whatsoever to try to satisfy the requirements of the plain error doctrine. I'm sorry. I'm confused. I think it is important to know what was objected to and what wasn't, and I know Judge Fletcher knows the record well, so watch carefully with how you answer this. There was an objection, or there was a proffer of the documents, which was rejected under 608. Correct. The issue was whether... Yes or no? Yes, that's correct, Your Honor. Okay. That is not reviewed under plain error. Pardon, Your Honor? That ruling we do not review under plain error. Whether they were admissible or not? Yes. Well, certainly the defendant must provide a theory of admissibility in order to... Now you're arguing the merits. I'm asking you plain error, not plain error. Okay? Do we review the 608 ruling for plain error, or do we review it under the normal standard of admissible evidentiary rulings? Or is there some third... Okay. Whether an item is... Whether a piece of evidence is admissible or is not admissible under Rule 608B is a question of law. That's a question of law. But that's the first part of the test, and the second... I don't think you're listening. Perhaps not. Okay? You were talking plain error. Yes. Okay. Do you understand what you were saying when you said plain error? When you say plain error, there's no objection below. We have to review it so there's no objection below. Yes, that's correct. I have a simple question as to the 608 evidence. Do we review it under plain error, or do we review it under the normal standard of admissible to errors of evidentiary rulings? Where the argument is not made below, you rule under the... I know the law. I know how the law works. I'm asking your position on behalf of the government. I don't understand why it's taken so long to get an answer out of you. Plain error. The plain error standard. So there was no objection on the 608 ruling. Your position is this is reviewed for plain error. There was no objection on the basis of any legal theory that's being advanced now. No. Your impeachment. Your impeachment. Wait a second. Wait a second. Can I ask a question, please? I mean, I sat here for 10 minutes while one judge asked questions, and I'd like to ask one. What I don't understand is the defense attorney wanted to have the document admitted into evidence, correct? Correct. So we asked for it to be admitted into evidence under 608, right? That's right, Your Honor. Okay. And the government opposed that, right? That's correct. And the district court ruled, and he ruled in favor of the government, and he disallowed the introduction of the document. Under 608 and 403. Okay. So I don't understand how that could possibly be plain error when you have an evidentiary ruling under 608D. Perhaps I answered incorrectly in response to Judge Kuczynski's question. Perhaps. That ruling is properly addressed under the harmless error standard, yes. But, of course, the arguments that are now being advanced are not Rule 608B arguments. They are not being argued. The argument is not that these are being made for their impeachment purpose, but they are being made for some other purpose. Because they show bias, because they refuse communicative conduct. These are not Rule 608B arguments. Rule 608B applies only to the use of extrinsic evidence for general impeachment purposes. The judge was clearly correct in that ruling. And, of course, that was only the first part of Judge Kuczynski's argument. He's only correct in that ruling if this involved general impeachment. That's correct. Defense counsel argues that this was not general impeachment, that this was essentially what the witness testified to. He testified to being a combat veteran. He represented himself as such. And this was impeachment of his actual testimony. It's not a 608 matter at all. That's the argument. So, you have now conceded. I'm glad Judge Wardle was able to ask the question better. So, this is not plain error. This is normal review for everybody. Then there needs to be consideration given as to whether the non-608B reasons that were being advanced at trial were advanced in the district court. Yeah, we want to prove he's a big fat liar because he's sitting on the stand claiming to have been wounded in combat. And we have evidence here that shows that he's a big fat liar. Now, what could be more central or more relevant than the evidence that the person on the stand has told lies? What does that have to do with 608? Well, it doesn't. In fact, this court addressed the issue. So, you're admitting, you're confessing error on behalf of the district court? No, absolutely not. The court has addressed that issue in the United States versus Castillo. And what Castillo's decision says is that where evidence is volunteered on direct examination, impeaching evidence or extrinsic impeaching evidence can come in for purposes of rebuttal. Where, however, the evidence is extracted on cross-examination, the rule is different. It's left to the discretion of the district court judge. If the rule were different, it would enable an opposing party to create a straw man by asking a question to which he knew he would get a false answer. Yet a denial of the evidence... The prosecutor here represents him to be a combat veteran. This is hardly laying a trap for the witness. This is hardly that situation. The prosecutor himself tells the jury that this is what this guy is going to be. At the time that testimony was presented, or that statement was made by the prosecutor, he believed it to be true. And it's never retracted. So, the prosecutor says an opening statement. This is a man who was wounded in combat. Swisher then takes the stand as soon as the trial opens, wearing a Purple Heart replica, confirming precisely what it is that the prosecutor stated in the opening statement. It seems to me that we then have clearly represented to the jury, both in the opening statement and in the wearing of that Purple Heart replica, this man is a combat veteran. I see no reason at all why you can't keep something out that contradicts that. Of course, the point that your argument predominates is by the time that occurred, Judge Coleman, at the defendant's request, struck the testimony about the defendant's actual service record in this case. Moreover... At the time what occurred? He did that only at the very end of the day. Well, it occurred twice. It occurred on the 14th. I'm talking about the first day of testimony. Yes. We have an opening statement on the Friday before, where he is represented by the prosecutor to be a combat veteran. He then takes the stand on the 14th. He says, in response to the government's question, I was in the Marines. The government refuses to ask questions about what he had done in the Marines about combat because the government by now is very suspicious that he was in fact not. We then get cross-examination that closes because he doesn't have the letter. As soon as the letter shows up, he reopens and he asks him about it. And the district judge, as soon as everything blows up, the district judge says, I'm not going to let you introduce that letter you got from Mr. Tolbert. Even though it's clearly impeachment evidence, directly going to the statement, I am a combat veteran. See this? I'm wearing a purple heart. And he got it from the government. Well, he received the Tolbert letter from the veterans from the U.S. Army. Yes, he did. I have no idea. I simply can't understand why that is not legitimate impeachment evidence in response to affirmative evidence presented by Swisher. Because this court's decision that makes a distinction between direct testimony and testimony. He gets up on the stand as part of his direct testimony. He was wearing a purple heart. That's direct testimony. Just as a father getting up on the stand wearing a clerical collar. As I've said, Your Honor, that would be a fine predicate to admit this evidence if the argument had ever been made that it was a testimonial. But the first time that issue was raised was by the defendant in his brief on a motion for a new trial. Judge Tolbert was simply never presented with that argument at trial. The defendant presented it for the first time in his petition in his motion for a new trial. But, you know, things happen during trials. They're getting information by fax and they finally get information from the Army that came in or those records and all of that. And, you know, we're looking for the truth here, aren't we? Yes. Isn't that what we're looking for? And you know that there are a lot of people claiming to be medal holders that are phonies. You know that, don't you? Say yes or no. Of course I know that, Your Honor. Sure you know that. It happens every day. You know, I get the Marine Corps Times and almost every week when I get it, there's always somebody that they're nailing for it. It could be a false medal of honor. Of course, they're easy to trace. It could be a false Silver Star. Our government knows that. But there are proper and there are improper mechanisms for impeachment. And as the Supreme Court has recognized in Fenster and Vannarsdale, the primary mechanism is cross-examination. The defendant twice refused to enter to- Well, I asked the appellant's counsel that question. I said I would ask it of you. You know, how do you analyze the import of appellants? Well, it would have been trial counsel's declination of cross-examination. It was a tactical decision because he didn't want to risk alienating the jury. On the 24th, on June 24th- Well, Mr. Worden basically said, you know, he didn't want to fall flat on that. He wouldn't have fallen flat. And he demonstrated that. He didn't have the goods on the guy at that time. Oh, yes, he did. On the 24th, what he had was the Talbert letter. He had the letter from Lieutenant Colonel Dowling saying that this whole document, this whole DD-214 is a fraud. And he had the defendant's military personnel file. Judge Coleman comes into court on the morning of the 24th of January and said, I've been through all this. He said, I've got a number of problems with it. It's not self-authenticating. It's hearsay. How can it not be self-authenticating? It comes from the personnel headquarters in response to his subpoena. Well, because there is no compliance with Rule 902 here that talks about self-authenticating and non-self-authenticating documents. In fact, the defendant's attorney at trial conceded that it was not self-authenticating. You had a hearsay problem. You had a Rule 403 problem. And you had a Rule 608B problem. And the defendant's attorney didn't take one step to assist the trial judge in solving any of those problems. These official communications that he got, what should he have done to self-authenticate them? Of course, Rule 902 talks about seals and all that stuff. But the way to authenticate them was to bring somebody in there. Who? I have to get somebody from Washington, D.C. I don't know. It could have been somebody from the Veterans Administration's committee. Let me ask you something. How did the district court judge propose to let the defense counsel use the documents? Okay. He said to the defense counsel, and these are his words, you may take the impeaching documents and stick them under the switcher's nose and ask the impeaching questions. So was the defense counsel allowed to refer to the documents? Absolutely. Was there a document here from the Conell Center from Washington, D.C.? Absolutely. Indeed, what happened in this case, after Judge Tolman said that, the defense counsel proposed the types of questions that he would ask. Gee, I could ask him, isn't it true that you were wounded in action in the state of Washington in an automobile accident? That far from being a model Marine, you were reduced from corporal to private first class under Article 15? Could he say, based on your personnel file, isn't it true that? Yes. And that's exactly, they are exactly the types of- Wasn't the defense counsel a little bit concerned, though, that without those documents in front of the jury- Well, I believe that he was, certainly. But he certainly demonstrated that he knew how to use those documents, and as Judge Tolman pointed out, there is nothing in his military personnel file, no citation, no orders that suggested entitlement to a declaration. Isn't that an obvious line of cross-examination? Well, it is, but the question isn't evidence. Pardon me, Your Honor? The question isn't evidence. That's true. The documents are evidence. And in order to get those documents in, you had to surmount three hurdles. First, there has to be a rule of evidence that allows you to get them in. The only rule that people were considering at this time was Rule 608B. And none of these other theories- Let me ask you a different question. I've got a different question. So far, we keep rehashing the trial itself. One of the three grounds on which reversal is sought here is the denial of the motion for retrial. That's correct. Now, on retrial, if we're talking about are we going to get a different answer on retrial, I'm not sure you even need to introduce the documents, because as soon as you put Swisher on the stand, and as soon as Swisher starts to lie, the government is going to be required to step up and say, you know, I can't support this anymore because the government now knows the truth. So if we're talking about retrial, as soon as we ask, did you lie at trial the first time around? Did you do this? Did you do that? Mr. Swisher will be required to tell the truth, and the government will be required to make sure that he does or not to let him get on the stand. Isn't that right? And let's talk about- Is that correct? Yes. Let me talk about it hypothetically. I think I heard you say yes. Now you've brought it up, Your Honor. I think I heard you say yes. Would you answer the question? What was the question? I said, is what I said true, that we don't need to get the documents into trial if we're on retrial? If we're on retrial, the government will be required to ensure that Mr. Swisher tells the truth as the government now knows it. Oh, absolutely. Okay. No question about it. So on retrial, all this stuff is irrelevant because Swisher will be required to say exactly what we've just been going over. I lied, I lied, I lied, and I did it as I tried to get a conviction from Mr. Hames. Let's talk about a hypothetical retrial using these two other documents that I maintain, incidentally, are cumulative and non-numerally discovered. In a hypothetical retrial, we would have to call Mr. Swisher again to establish that he represented himself to be a Marine, a combat veteran, and that in response, these solicitations were made. The government would probably not testify, make false statements concerning his record as he did here. The government would probably also front the fact that he lied at the initial trial. What would the jury think? Well, there goes old Swisher again, being the persona of the wounded veteran, the very persona that resulted in his being solicited by the defendant to commit these murders. That's what we're talking about here, a false persona that this individual created, that he used as a mechanism. But, you know, you don't know that. You don't know what a jury's going to do. This is a very vital piece of evidence. You can't second guess what a jury of 12 people is going to do. I mean, I've been involved in a lot of trials in my life. You know, you get it out there that this guy is a liar, and he represented, he was a combat veteran, and he talked to this fellow Swisher, you know. And he pulls a cordon. I don't know what the jury's going to do. My guess would be they'd probably do what they did in the other six counts. We don't, and that's precisely... They came back with the verdicts of not guilty. And that's precisely why we leave these decisions to the discretion of the trial judge and why the standard of review is so rigid with respect to... So you're telling me that when Swisher gets on the stand on retrial and is asked, did you lie the first time around, yes. Did you pull forged documents out of your pocket? Yes. They go through the whole thing, not just were you or were you not in combat. That's the easy part for Swisher. The harder part is to say, and you perjured yourself repeatedly under oath. You brought into court intending to perjure yourself a forged document, which you pulled out of your pocket. And you did that in order to convict Mr. Hinkson the first time around. You're saying to me that we're going to get a conviction of Hinkson based on Swisher's testimony now? Well, of course, the thing that Your Honor's de novo review of the evidence failed to take into account is all the corroboration there were with respect to the key points of Hinkson's testimony. You said de novo review. Yes. Someone who's asked under the applicable rule to determine whether or not there would be probable acquittal, you have to look at the evidence. An appellate judge who does not look at the evidence is in dereliction of duty. And I went through it in considerable detail, doing exactly as I was required under the rule to do. Well, the fact that the fifth part of the Harrington test is whether the probable result would be an acquittal, I would like to hear what your best argument is on what the evidence was other than Swisher. Certainly, Your Honor. Where I think Your Honor went wrong, quite frankly, in making that assessment is you relied solely upon the fact that there were no other witnesses who could present direct testimony that they heard the solicitation being made. What you did not consider was the strong circumstantial evidence that supported every bit of Swisher's testimony concerning the communication of the solicitation to him. And I want to review those in detail, if I may. I would like you to do that, too, because that's a question that's on my mind as well. But when you're doing it, I'm wondering if you could imagine a trial without Swisher. Could the government retry this case without putting Swisher on the stand? In the particular test that we're talking about. And if so, what evidence is there? No, you would need Swisher to present the testimony that he was solicited by Hinson, by the defense. I'm very interested in judging. And what you have here. First, the jury would learn through the testimony of Richard Ballot that Hinson believed Swisher to actually be a combat-hardened Marine. That his anger toward these three officials was the central focus of his life, quote Ballot, and that he said he would pay to see them dead. It would learn that after the appellant offered an employee in London, Birmingham, $10,000 to kill an attorney named Albert, appellant told him that Lodge, AUSA Cook, and Investigator Hines, and he wanted them killed. It would learn that in soliciting an acquaintance named James Harding to murder these individuals, he told them he would pay Harding $10,000 to kill each of them that he hated. And he was acquitted on the Harding counts. The jury hung on three counts and acquitted on three counts. We don't know why. It's pure speculation. I think I know why. I read the record. In addition... What did Hinson testify to? Hinson flat out denied that he'd ever made the solicitations in the first place. What was his testimony relative to Harding? He denied making the solicitation. Wasn't he on tape on some of the solicitations? Harding tried to tape him, but he suspected that Harding was taping him, and he was very evasive on that particular occasion. I thought Hinson testified to a bunch of other stuff. It sounded kind of crazy to me when I read it. Well, he did. There was testimony. There was testimony about how he... Did he deny what he said to the FBI? No, he did not. What did the FBI agent say he said? The FBI agent asked him what he had said about offering money to others. He told the FBI agent that he had, in fact, told Harding that it would be worth $10,000 to have each of these individuals killed. And one other critical element that you haven't taken into account is the testimony of Chad Croner, the defendant's cellmate while they were in pretrial detention. That testimony was that he offered Croner $10,000 to kill each of these individuals and told Croner that he had made the same offer to Swisherbeck. That's highly unreliable evidence. Counsel, before we run out of time, help me on one other thing. Why didn't the prosecutor have to say in closing argument that Hinson's answers to defense counsel did not appear to be supportable? Why didn't he say that? I believe there are two reasons why he didn't say that. First, because he viewed that testimony as having been stricken. Second, because Judge Tormund, during a sidebar conference, told counsel for both sides of this. So the state of the record at this point before the jury is that the jury is not to consider Mr. Swisher's battlefield commendations or lack thereof. So the apparent reason is that he felt he was foreclosed from making any comment by virtue of the judge's ruling. But getting back to Chad Croner, I don't think the court has taken into account his testimony as Judge Tormund. You know, I think I can help you get past some of this. It's undisputed, and I take it absolutely at face value, that Hinson asked everybody and his dog to kill these people and he offered everybody and his dog $10,000 to do it. The testimony is unambiguous on this point, from Harding, from everybody. The question is whether he was serious in the solicitation. That's the issue. Not whether he offered him $10,000. We know he did it, and he did it to everybody. And, of course, doing it to everybody raises some suspicions. Well, maybe he's a nutcase, and maybe this isn't really a very good money-for-hire thing. Maybe he isn't all that serious. Maybe it's kind of along the line of his Fedapult. A Fedapult, for those of you who don't know, that's a catapult designed to throw federal agents into canyons. But who are the people to whom he made the solicitation? Three individuals who he believed to be familiar with firearms and to own firearms. What do we know about them? And one of them is Harding, and we get an acquittal as to Harding.  You can't use the fact that that's not an acquittal. Well, I think we can use the acquittal as we're trying to predict what might happen on retrial when Swisher proves to be an absolutely shameless liar pulling forged government documents out of his pocket. And it's precisely for his ability to lie, concerning his military record, that he was hired here. It's our submission. You seem so confident as to what would happen, but the trial counsel who was there wasn't so confident. He didn't say, fine, let in the documents showing this guy is really a fraud. He didn't go to the jury and say, you know, when I said he's a combat veteran, I was misled, like everybody else. He's not. Now, he pretended to be a combat veteran, and Hinkson believed him. We think we've shown evidence that Hinkson believed him. But let me just make it clear, you know, I think that he is not in fact, and he lied only because he was. If the government were really that sure, before the verdict, as to the relevance of that testimony, that's what you'd expect a conscientious prosecutor to do. You'd expect him to do it even if he thought it might jeopardize the conviction. The trial counsel stood on the four corners of Rule 608B, which he thought he applied here, as did Judge Tolman, and he was never disabused of that fact by trial counsel. But as you know from progeria and other cases, the prosecutor can't just stand on the four corners of those irrelevance. The prosecutor also has a responsibility to be forthright and to obtain conviction only by means that are entirely respectable. And putting forth a statement, or presenting a witness as being something, and then having them disintegrate, and then opposing, opposing, opposing, debunking that lie, just doesn't strike me as being very commendable conduct of the father prosecutor. Bear in mind, Your Honor, the only testimony that Mr. Sullivan, the prosecutor, put forward is what Swisher told the defendant about his servants. He never indicated in his opening statement. I'm sorry, he didn't indicate in his opening statement that he was, in fact, a combatant? When he made that statement, in his opening statement, he fully believed it to be the case. You just said to me, you just said, the only thing he said, he presented, was what Swisher Thorpe thinks. And now you tell me something else. How can you be so forthright? I distinguish between his opening argument, at the point in time when he truly believed that to be the case, and his direct examination. And he could have checked that out, too, you know. It would have been very simple for him to check it out. Made a phone call to the Marine Corps, I can give you the phone number. They got a card file, take them five minutes to look through, and they give you the answer. Well, he did check it out, Your Honor. We know that on the morning of Swisher's testimony, he should have checked it out before. Well, perhaps. He was really prepared. Well, perhaps. That he should have known that there are a lot of people go around with phony methods. But that's not tantamount to prosecutorial misconduct or Brady violation. Let me ask you this. You submitted some documents that you asked us to take judicial notice of. And you represented in your papers accompanying those documents, that they show that the government was not aware of these lies at the time they put Swisher on the stand. Is that correct? What the documents showed. Is that correct? Yes. But I see nothing in there from Agent Long. In the trial court, Sullivan says, we got the dowling letter from Agent Long. And the question might be, well, what did Agent Long know and when did he know it? Not to coin a phrase. If you're trying to show us that here, judicial notice seems like an odd way to do it. I'm missing a very key affidavit. It appears that it was not Agent Long who actually went to the Veterans Administration to get the documents. Well, then, Mr. Sullivan didn't say the truth to the trial judge. That's what Mr. Sullivan told the judge. The record doesn't show that. What the record shows is that Mr. Sullivan says, Mr. Long, our investigating agent, got this information. That's what Mr. Sullivan said. It may or may not have been true. Well, the documents show that the Veterans Administration turned them over to an IRS investigator. Now, I don't know what the IRS investigator did. What they do is they nailed down the question that those documents were not in the investigators' or the prosecutors' hands prior to the 19th of January. And you're saying in this sort of trial hearing we're having right now that Mr. Long had no role in this, despite Mr. Sullivan saying that he did? Does he say there might have been two ways that the information comes? I have no personal knowledge of whether the documents were transferred by the IRS investigator to Mr. Long who handled them over to Mr. Sullivan. What I'm saying is, I think you can sense it indirectly, we are in absolutely no position here to decide the truth of that matter, even as the documents you tried to present here as judicial notice. The documents in which I have asked you to take judicial notice demonstrate that the Veterans Administration placed those documents in the hands of the prosecutive teams on the 19th of January, not on the 13th, not on the 14th, and the 19th, four days after this testimony was completed. Thank you. Now, tell me, was Swisher prosecuted for perjury in this case? Was Swisher prosecuted for perjury? Swisher was prosecuted for other offenses relating to the agency. Did you hear my question? Yes. Not to my knowledge, Your Honor. Why doesn't the government prosecute for perjury people who testify or perjure themselves? I don't have personal knowledge why those particular charges were chosen, but one of the offenses that he was convicted of was wearing a false decoration. I'm sure that's quite as serious as perjury. It's not quite as serious. Uh-huh. Okay, thank you. We'll give you a minute for your bottle, if more than you set your time. An important concession here. The government just said that these arguments that they could come in for bias or communication, silent communication of good arguments, but they weren't presented to the trial court. At ER 138-140, they were presented in the new trial motion, and the trial judge ruled that the evidence was inadmissible for those purposes. Those rulings are wrong, the government essentially concedes. They said the communication argument is a good one, and what it shows is that the trial judge had erred in believing that this was inadmissible evidence. The defense never offered it under 608. That was the trial judge's objection to it. The event evidence offered it, and this is in the government's own brief, to show that it was relevant to what Swisher had told Hinkson, to whether Hinkson had believed his representation. That is a military background, and to show that Swisher had lied to the jury and produced a false document in court. That was the offer of proof. Mr. Reardon, was Judge Tallman ever told that one of the reasons why Swisher was lying was to protect his false veteran's claim? I don't believe that it was made that way. What was the basis for what was Bias even mentioned? Was Bias even mentioned to Judge Tallman in some sort of offer of proof made as to what would invoke Bias and prejudice? Yes, it was in the new trial motion. In the new trial, but not a trial. No, and one reason for that, though, Judge Beyer, is that the government violated its Brady obligations and didn't turn over the defense to the documents it had showing from the Veterans Administration saying we are being defrauded. It did not turn over the Keeley documents. What is the evidence as to when the government had those documents? They produced it, December, January 19th, three or four days before trial closed, before Judge Tallman finally made his ruling. That's the evidence in their judicial notice, and in our response to that we pointed out. One final point to close on. The notion that, and this was an error by the trial court, that the result would not be different in the new trials for Claspers. There can be no new trial because the government has conceded. It can't ever put Swisher on the stand because he'll continue to say that this is true after he was exposed. I don't see that. I mean, bad prosecutors marry their informants all the time, and good ones will often just tell the jury right up front. My informant is a man who, without corroboration, should not be believed, and then they put on the corroboration. But they can't put on a witness who says he's going to tell you. He sued the Secretary of the Treasury after this case was over, saying he was a combat veteran. They can't put on a witness saying he is going to perjure himself, but don't believe him. No, you can't ask him questions that will leave perjurious answers. You can put on a witness that you think might perjure himself on cross-examination, for example, but you can't put him on the stand and ask him questions that you know he'll lie to. That's the rule, Mr. Nuremberg. In any event, we are out of time. Thank you, Your Honor. Thank you, counsel. We are adjourned.
judges: Kozinski , Pregerson , O'Scannlain , Kleinfeld , Wardlaw , Fletcher , Paez , Callahan , Bea , Ikuta